## In re BREEDER'S MARKETING ENTERPRISES, INC., Debtor.

### Joseph W. HAMMES, Trustee, Plaintiff,

### v.

### Maurice WILLING, Defendant.

### Bankruptcy No. IP83–4834.
### Adv. No. 84–450.

United States Bankruptcy Court, S.D. Indiana, Indianapolis Division.

March 11, 1985.

Neil E. Shook, Rubin & Levin, Indianapolis, Ind., for trustee.

Joseph W. Hammes, Dein, Hammes, Stanley & Ripley, Indianapolis, Ind., trustee.

James W. Bradford, Indianapolis, Ind., for defendant.

### ENTRY ON COMPLAINT TO RECOVER PREFERENTIAL TRANSFER

ROBERT L. BAYT, Bankruptcy Judge.

This matter came before the Court on the 8th day of January, 1985, upon the trustee's Complaint to recover preferential transfer, pursuant to Section 547 of the United States Bankruptcy Code. The Court, having considered the evidence presented at trial, now makes the following:

### Findings of Fact

1. On December 22, 1983, Breeder's Marketing Enterprises, Inc. ("Breeder's Marketing") filed a voluntary petition for relief under Chapter 7 of the United States Bankruptcy Code.

2. Breeder's Marketing was incorporated on or about September 10, 1982, and began doing business on or about the same date. Breeder's Marketing sold breeder rabbits to individuals, who would breed those rabbits, producing offspring, and Breeder's Marketing would then be obligated to repurchase from those individuals the offspring of the breeder rabbits at a price of $2.00 a pound. Breeder's Marketing ceased doing business on November 15, 1983.

3. Maurice Willing ("Willing") was the president of Breeder's Marketing from the date of its incorporation until Breeder's Marketing filed a petition for relief under the United States Bankruptcy Code on December 22, 1983. Willing was also a stockholder of Breeder's Marketing and was involved in the day-to-day operations of the business and was familiar with the financial affairs of Breeder's Marketing.

4. At the inception of the corporation, Breeder's Marketing owed to Willing the sum of $15,574.96 which represented an officer loan from Willing to Breeder's Marketing, such being the excess cash other than that capitalized in the individual account of Willing who operated a similar business of Breeder's Marketing prior to the incorporation of Breeder's Marketing.

5. During the life of Breeder's Marketing, the debtor repaid the loan to Willing in full. The following sums were paid on behalf of Willing by Breeder's Marketing at the following times:

| | |
|---|---|
| January, 1983 | $ 662.17 |
| February, 1983 | 984.53 |
| March, 1983 | 1,986.21 |
| April, 1983 | 1,974.38 |
| May, 1983 | 1,504.58 |
| June, 1983 | 1,271.03 |
| July, 1983 | 2,060.60 |
| August, 1983 | 1,931.13 |
| September, 1983 | 1,234.12 |
| October, 1983 | 1,548.50 |

These sums, listed above, were paid to Willing which he used to pay personal obli-

gations, including his utility bills, charge card debts and the mortgage payment on his personal residence. Willing also used the money to pay the business expenses of Breeder's Marketing incurred in operating the business.

6. At the times specified above, the debtor's sales were healthy, payments to creditors for merchandise were being paid and the debtor maintained bank balances in excess of $20,000.00 up to approximately October of 1983.

7. At all times during the year 1983, Willing did not draw any compensation from the corporation or any expenses on corporate business.

8. The debts of Breeder's Marketing consisted primarily of the repurchase agreements for breeder rabbit offspring and the loan made by Willing. The contract holders were paid over $100,000.00 over the course of their repurchase agreements.

and based upon the foregoing findings of fact the Court now makes its

### Conclusions of Law

1. This is a hare-raising tale fraught with broken dreams and ambitions. Willing and the contract holders wanted to do for the rabbit what Colonel Sanders did for the chicken. The debtor, throughout 1983, operated a successful business venture. Contract holders under the repurchase agreements were paid over $100,000.00 for their rabbits during the course of the year. It is presumed that the contract holders made good use of their rabbits either as food, fur or barter after the filing of the petition in bankruptcy. Although these contract holders were listed on the schedules as being owed $30,000.00, that amount should be reduced by the intrinsic value of the rabbits themselves. Given the geometric progression of rabbit procreation, enough value would have been created to offset the amount owed to contract holders rapidly enough. The problem rises, of course, with the repurchase agreements.

2. The liability created by the buy-back contracts was indeterminate. The manner in which the contracts were written could have obligated the debtor to buy back the rabbits indefinitely. There was no time limit by which the debtor could say it no longer wished to buy back the rabbits from the contract holders. It was only this lack of time limitation that created the liability of the debtor. The Court does not believe that such a contract is equitably enforceable in nature, particularly given the fact that these contract holders were paid over $100,000.00 on these repurchase agreements.

3. This case also turns on the fact that Willing, as president, never took a formal salary from the business which was his only source of income. As noted he operated this business as a sole proprietorship prior to incorporation and if his accountant would have listed his excess cash account as capitalization instead of as a loan upon forming the corporation, then there would have been no problem today. Based on this technical oversight the trustee brought this preference action. The Court, using its equitable powers, determines that the money paid to Willing was in the nature of a salary for operating the business. He did use this money in paying for living expenses and the business expenses of Breeder's Marketing.

4. As mentioned earlier the business operated successfully throughout 1983. The bills were paid on time. The repurchase agreements were met and the bank account balances were substantial. It was not until September of 1983 that the bottom of the rabbit market literally fell out. It was only at this time that Willing realized that he would not be able to perform on his repurchase agreements. Up until this time the business operated successfully and was not insolvent and Willing had no reasonable cause to believe that the business was insolvent.

IT IS, THEREFORE, ORDERED, ADJUDGED AND DECREED that the law is with the defendant and against the plaintiff; that the trustee has failed to sustain

his burden of proof; and that judgment is entered in favor of the defendant and against the plaintiff on the trustee's Complaint to recover preferential transfer.